IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| ISIS ROBERTS, | ) | |
| | ) | Civil Action |
|    Plaintiff, | ) | No. |
| | ) | |
| v. | ) | JURY TRIAL DEMANDED |
| | ) | |
| BAD DADDY'S INTERNATIONAL, | ) | |
| LLC, | ) | |
| | ) | |
|    Defendant. | ) | |

## COMPLAINT FOR DAMAGES

COMES NOW, Plaintiff, Isis Roberts, by and through undersigned counsel, and files this Complaint for Damages against Defendant Bad Daddy's International, LLC ("Defendant"), and states as follows:

## INTRODUCTION

Plaintiff Isis Roberts ("Plaintiff") brings this action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e et seq., to redress unlawful discrimination, harassment, hostile work environment, and retaliation committed by Defendant Bad Daddy's International, LLC ("Defendant").

## JURISDICTION AND VENUE

### 1.

Plaintiff invokes the jurisdiction of this court pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 2000e-5(f).

### 2.

The unlawful employment practices alleged in this Complaint were committed within this district.  In accordance with 28 U.S.C. § 1391 and 42 U.S.C. §2000(e)-5(f), venue is appropriate in this Court. Venue is proper in this District because the acts of discrimination and retaliation occurred in Defendant's Decatur, Georgia restaurant, located within this District.

## **PARTIES**

### 3.

Plaintiff is a citizen of the United States of America and is subject to the jurisdiction of this Court.

### 4.

Defendant Bad Daddy's International, LLC is a corporation with its principal place of business at 651 Corporate Circle, Suite 200, Golden, Colorado 80401. Defendant operates restaurants, including the location in Decatur, Georgia, where Plaintiff was employed.

5.

Defendant may be served with process by delivering a copy of the summons and complaint to its agent for service, Registered Agent Solutions, Inc. at 900 Old Roswell Lakes Pkwy. Suite 310, Roswell, GA, 30076.

## ADMINISTRATIVE PREREQUISITES

6.

Plaintiff timely filed a charge of discrimination against Defendant with the Equal Employment Opportunity Commission (EEOC), alleging retaliation under Title VII of the Civil Rights Act of 1964.

7.

Plaintiff received her Notice of Right to Sue on July 15, 2025. This action has been commenced within ninety (90) days of receipt of the "Notice of Right to Sue" on that Charge.

## FACTS

8.

Plaintiff was hired by Defendant as a Line Cook on or about February 17, 2025, at Defendant's Decatur, Georgia location.

9.

On or about March 15, 2025, coworkers discovered Plaintiff was a lesbian. Thereafter, she was subjected to frequent derogatory and degrading comments based on her sex and sexual orientation.

10.

Line Cook Gary, Prep Cook Sylvia, and other employees repeatedly told Plaintiff she should "try dating men" and "take dick," implying she could be changed to no longer be a lesbian if she would have sex with men. Plaintiff objected, but the comments persisted several times a week.

11.

They also consistently pressured Plaintiff to date a male coworker, who was gay, and would consistently crack jokes about it at Plaintiff and the other employee's expense.

12.

Plaintiff routinely asked to be left alone and for the comments to stop, but the comments and behavior described above continued to occur at a rate of approximately two to three times a week until the end of Plaintiff's employment on or about May 28, 2025.

13.

Gary also frequently insulted Plaintiff's appearance, saying no one wanted to "hit that," that she was not feminine enough, generally that she did not meet gender based stereotypes about what was pleasing sexually to men, and referred to her as a "bitch."

14.

Frequently, these comments would be made almost every shift that Plaintiff worked.

15.

Other employees would overhear the comments being made to and about Plaintiff, which further humiliated her.

16.

Between March 15, 2025, and April 28, 2025, Plaintiff reported the harassment to Kitchen Manager Andrina and later to Area Manager Krista Cheshire approximately four times.

17.

In between March 15 and April 28, 2025, Sylvia told Plaintiff that Cheshire had showed her some of Plaintiff's complaints and said that Cheshire did not take Plaintiff's complaints seriously and that she was tired of Plaintiff writing her "long

ass emails," which were a reference to Plaintiff's complaints about sex based harassment.

18.

When Plaintiff would report the harassment to Andrina, Andrina would tell her that she should just ignore the harassment, even laughing when Plaintiff would relay the degrading and harassing comments, did nothing to stop it.

19.

On or about April 20, 2025, because Plaintiff saw her hours had recently started being reduced, Plaintiff complained to General Manager Adam that her hours were being cut and about Gary's continued sexual harassment, including reporting that he was saying she was not feminine enough, that he would say she needed to start taking dick, and that he was calling her a bitch consistently.

20.

Adam said he would check on Plaintiff's hours and that he did not approve them to be cut and in regards to the harassment complaints simply stated that he did not know what was going on. Adam took no action to remedy the harassment.

21.

On or about April 28, 2025, Gary made numerous harassing comments towards Plaintiff about her appearance and femininity in front of other employees while laughing at her.

22.

After Plaintiff had ignored ten or so of these comments, Gay asked two male employees loudly if they would have sex with her, asking them if they would "hit that" when Plaintiff bent over to get some trays out of the oven, again implying that Plaintiff was not feminine enough for men to want to have sex with.

23.

He then turned around to some of the servers and said that every day, Plaintiff, referring to her as "this bitch," wanted to come in and show everyone her ass.

24.

At that point, Plaintiff told Gary to stop looking at her butt.

25.

In response, Gary started screaming at Plaintiff, saying "you dirty bitch, no one wants to see your gym shorts" and began calling her a "fat bitch" and a "nasty bitch."

26.

During this time, Plaintiff continued to ask Gary to just leave her alone.

27.

A few minutes later, Andrina entered the kitchen and told Plaintiff to clock out and go home.

28.

Plaintiff protested, relaying again the harassment that Gary had subjected her to and reminded Andrina of her earlier reports, to which Andrina told Plaintiff she did not care what she had been called and that she had not been there to witness the earlier behavior (that Plaintiff had reported to her) so she did not care about that either.

29.

In front of Andrina, Gary continued to yell and scream at Plaintiff, saying she was a "dumbass bitch" and a "nasty bitch."

30.

Andrina weakly told Gary that if he did not stop he could be sent home but did not try and stop him from harassing Plaintiff or tell him that his conduct was inappropriate.

31.

At that point, Gary told Andrina that he did not "give a fuck" about his job and clocked himself out and went home.

32.

Afterwards, Plaintiff asked Andrina for her employee meal, which she was supposed to receive for working, and Andrina asked her if she was crazy, told her no, and blamed Plaintiff for the situation, saying that she was now going to have to fill in for Gary.

33.

Gary faced zero consequences for his actions.

34.

The next day, Andrina wrote Plaintiff up, falsely accusing her of yelling at Gary at the top of her lungs just because Gary had asked her to pull her pants up and said that he only made his harassing comments because he could see Plaintiff's gym shorts.

35.

She also accused Plaintiff of being out of compliance with Defendant's uniform policies, but Plaintiff had worn the same shorts before and continued to

wear them without issue after this date. The next day, she confirmed with General Manager Adam that she had dressed within dress code on the day of the incident.

36.

During the meeting with Andrina, Plaintiff complained again about the aggressive sex-based harassment and comments that Gary had been making to and about her throughout her employment, including the day before, specifically reporting that the harassment Gary was engaging was a clear example of sexual harassment, and asked Andrina to check the cameras from the day before to review the incident.

37.

Around this same time, other employees told Plaintiff that management was trying to "railroad her" with this writeup and that they had overheard Andrina say to Adam that Plaintiff was a problem.

38.

Plaintiff's shifts were further restricted. On April 29, 2025, Daniel Williams denied her a shift, apologizing and saying he was "told to." Plaintiff learned that Andrina had ordered this denial.

39.

Prior, Plaintiff had had no issues picking up shifts that were available and neither did other employees.

40.

As a result of her shifts continuing to be cut, Plaintiff requested that Adam only schedule her for three days a week so that she could find another job and have stable employment, but Adam told her not to worry about it, that she was hired as a full time employee, and that she would be scheduled as such.

41.

However, Defendant continued to schedule Plaintiff at a lower rate, decreasing her earnings.

42.

Because nothing had been done, Plaintiff made clear to Gary that the way he was talking to her was unacceptable.

43.

In response, Gary got in Plaintiff's face and made threats that he would bring his family members to work to "beat your ass, dumbass bitch" and continued to call Plaintiff a dumbass bitch and a "fatass bitch."

44.

Other employees had to physically get in between Gary and Plaintiff to keep him away from her.

45.

Plaintiff then returned to her station, but shortly thereafter, Andrina told Plaintiff to clock out while Gary was allowed to continue working.

46.

Plaintiff explicitly complained to Andrina that she was the one being penalized when Gary was the one who kept sexually harassing her and said she was being punished for Gary sexually harassing her.

47.

Andrina then told Plaintiff that she had just started her shift, that she was not aware of what was going on, and like the previous incident, that she did not even care.

48.

Shortly thereafter, Andrina came outside where Plaintiff was and asked her what had happened because other employees had complained to her that what she had done to Plaintiff was unfair.

49.

Plaintiff had been outside crying, and while continuing to cry, she again reported to Andrina that it was not fair for her to be treated the way she was at Defendant and said that every time she complained about Gary's harassment of her, she was being punished, which was emboldening Gary to harass Plaintiff in more extreme and humiliating ways.

50.

In response, Andrina just told Plaintiff to not let anyone at a "burger bar" make her as upset as she was (meaning profusely crying) because her job was just "burgers and fries" and walked away.

51.

Plaintiff later learned that even after she had left the location, Gary had continued to make sex based derogatory and demeaning comments about her like the ones described above.

52.

Plaintiff then found out that Andrina had removed her from the schedule, and when she spoke with Andrina, Andrina told her she was being given space to relax and again to not let other people at Defendant stress her out.

53.

Plaintiff reported the situation to Defendant's Human Resources Department on or about May 5, 2025, telling them about the harassment and retaliation, that nothing was being done about it, that others at the job were telling her how unfairly she was being treated, and requested that camera footage be reviewed.

54.

On or about May 6, 2025, Plaintiff told Adam she believed she was being penalized whenever she spoke up about or tried to stop the sex-based harassment she was facing.

55.

In responding, Adam, among other things, criticized Plaintiff for going around the chain of command and for filing complaints which he said management did "not give a shit" about, told her to toughen up and not to take things personally, suggested that she was the problem in the situation, told her that her complaints were seen as a problem by management at Defendant and that management would prefer to fire her rather than address the harassment, that he did not have the time or willingness to "babysit" workplace conflicts, warned her that if anything else happened, she would likely be fired, and said that he was "not afraid" to say that Defendant could have already fired Plaintiff but that he was going to give her a chance and that it was time

for her to "put up and shut up," which meant that Plaintiff was going to have to put up with and shut up about the harassment she had been facing to remain employed.

56.

That same day, Adam told Sylvia about Plaintiff's meeting with him and another employee told Plaintiff that Sylvia said she had heard Plaintiff was fired.

57.

Plaintiff was then told that Adam had actually told Gary that same day that "management had his back" and that Plaintiff would be dealt with when Gary complained to Adam that Plaintiff had not been fired yet.

58.

On or about May 15, 2025, Plaintiff complained again to Cheshire and Human Resources employee Rachel that she was being retaliated against for speaking up for herself and establishing boundaries, that her hours were being cut, and that she was being written up.

59.

After this report, Cheshire began to show up at the work location during Plaintiff's shifts when prior, she had not been present for any of Plaintiff's shifts.

60.

On or about May 26, 2025, Cheshire came up to Plaintiff while she was talking with another employee, Joel, and told Plaintiff that she was writing her up for having a negative attitude.

61.

Plaintiff asked Cheshire what she was talking about but Cheshire just walked away.

62.

Plaintiff then complained to Cheshire and Rachel that them making assumptions about her without facts had become a pattern, that she had lost faith in the reporting process at Defendant, and that she believed Cheshire's actions were yet another act of retaliation that Rachel and Cheshire were behind, that she was still being reprimanded for trying to avoid and stop the harassment that she had been facing, that nothing was being done about her reports regarding Sylvia's harassment because Sylvia and Cheshire were good friends, and complained again that she was having her hours cut, that her access to her schedule was being blocked, and that she was constantly under fire for things that would not be issues with other employees.

63.

Plaintiff also complained that she had brought serious matters, including sexual harassment, to Defendant; s attention without any meaningful action occurring.

64.

Plaintiff also said that the writeups she had received were retaliation, said that she was not going to stop complaining, and that she could be fired as a result but that she was not going to accept disrespect on the job.

65.

Then, on or about May 28, 2025, Cheshire terminated Plaintiff, telling her that she was going to be fired for being late because she had not responded to a message about clocking in and had been late to work.

66.

Plaintiff had told Cheshire that she was at work and that she had not seen this message because she had already clocked in, but Cheshire terminated her anyways.

67.

Before and at that time, other employees of Defendant, including Sylvia and a cook who was three hours late one day, would consistently be late without any sort of disciplinary action.

17

68.

Although Defendant purports to provide legitimate non-discriminatory reasons for the adverse actions described above, these reasons are pretext.

69.

Plaintiff was treated less favorably in the terms or conditions of her employment than others outside of her protected class, i.e. individuals who did not engage in protected activity under Title VII.

## COUNT I: HOSTILE WORK ENVIRONMENT IN VIOLATION OF TITLE VII

70.

Plaintiff realleges Paragraphs 1–69 as if set forth fully herein.

71.

Defendant subjected Plaintiff to unwelcome harassment because of her sex and sexual orientation.

72.

The harassment was severe or pervasive, altered the terms and conditions of employment, and created a hostile work environment.

73.

After her reports, Defendant took no action to remedy the hostile environment, and so Plaintiff was subjected to continued instances of increasingly severe sex-based harassment.

74.

As a direct and proximate result of Defendants' violations of Title VII, Plaintiff has suffered damages, including lost wages and emotional distress.

75.

Defendants willfully and wantonly disregarded Plaintiff's rights, and its actions toward Plaintiff were undertaken in bad faith. Plaintiff is therefore entitled to punitive damages.

76.

Defendant is liable for the actions of its employees and supervisors.

77.

Plaintiff is entitled to punitive damages, lost wages and benefits, compensatory damages, attorneys' fees and costs, prejudgment interest, reinstatement or front pay in lieu thereof, and any other relief available under the law.

## COUNT II: RETALIATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

78.

Plaintiff repeats and re-alleges the allegations contained in paragraphs 1-69 as if set forth fully herein.

79.

Plaintiff engaged in protected activity by complaining to management and Human Resources about pervasive and severe sex based harassment.

80.

Defendant retaliated against Plaintiff by cutting her hours, issuing false writeups, and terminating her.

81.

Defendant's conduct violated Title VII.

82.

As a direct and proximate result of Defendants' violations of Title VII, Plaintiff has suffered damages, including lost wages and emotional distress.

83.

Defendants willfully and wantonly disregarded Plaintiff's rights, and its actions toward Plaintiff were undertaken in bad faith. Plaintiff is therefore entitled to punitive damages.

84.

Plaintiff is entitled to punitive damages, lost wages and benefits, compensatory damages, attorneys' fees and costs, prejudgment interest, reinstatement or front pay in lieu thereof, and any other relief available under the law.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests that this Court:

(A)    Grant Plaintiff a trial by jury as to all triable issues of fact;

(B)    Grant Plaintiff damages for lost wages and benefits and prejudgment interest thereon;

(C)    Grant Plaintiff general damages for mental and emotional suffering caused by Defendant's unlawful conduct;

(D)    Grant declaratory judgment declaring that Plaintiffs' rights have been violated;

(E)    Grant Punitive damages based on Defendant's willful, malicious, intentional, and deliberate acts, including ratification, condonation and approval of said acts;

(F)    Grant Plaintiff reasonable attorneys' fees and expenses of litigation;

(G)    Grant injunctive relief of reinstatement, or front pay in lieu thereof, and prohibiting Defendant from further unlawful conduct of the type described herein; and

(H)    Award Plaintiff such further and additional relief as may be just and appropriate.

This 21st day of August, 2025.


/s/ V. Severin Roberts, Esq
V. Severin Roberts
Georgia Bar No. 940504
Patrick Reid
Georgia Bar No. 888769
The Workers' Firm
(404)-382-9660
severin@theworkersfirm.com
patrick@theworkersfirm.com

Counsel for Plaintiff